IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 1, 2016 Session

**WESLEY JONES v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 1006236      James C. Beasley, Jr., Judge**

_____

**No. W2015-01481-CCA-R3-PC  -  Filed August 11, 2016**

_____

The Petitioner, Wesley Jones, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his first degree murder conviction   and   resulting life sentence.   On appeal, he contends that he received the ineffective assistance of counsel in numerous respects and that the post-conviction court erred by denying his request for a DNA expert and for DNA testing.   We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., delivered the opinion of the Court, in which ROBERT L. HOLLOWAY, JR., J., joined.  THOMAS T. WOODALL, P.J., filed a concurring opinion.

Lance R. Chism, Memphis, Tennessee, for the Appellant, Wesley Jones.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Alanda Dwyer, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The Petitioner's conviction relates to the death of Glenda Kimball, who died from manual strangulation.  The State's proof at the trial showed that the Petitioner was the last person seen with the victim before her body was found approximately twenty-four hours later.  The Petitioner admitted he spent time with the victim on the day before her body was found.   The medical proof showed that the victim died about twenty-four hours before her body was found.  Skin cells underneath the victim's fingernails contained the Petitioner's DNA.   The Petitioner had scratches he claimed came from a physical altercation with someone who attempted to steal his money at a nightclub.  The medical

evidence showed the victim engaged in sexual intercourse shortly before her death, but no semen was detected from the evidence collected in the sexual assault kit. *State v. Wesley Jones*, No. W2012-00301-CCA-R3-CD, 2013 WL 772782, at *1-4 (Tenn. Crim. App. Feb. 27, 2013), *perm. app. denied* (Tenn. July 11, 2013).

In his post-conviction petition and amended petitions, the Petitioner raised numerous allegations of ineffective assistance of counsel. As relevant to this appeal, those allegations are that counsel was ineffective for (1) failing to file a motion to suppress evidence as a result of police questioning of the Petitioner and collection of DNA evidence from him on the day after the victim's body was discovered, (2) failing to object to a DNA expert's report and testimony, (3) failing to retain a defense DNA expert, (4) failing to advise the Petitioner he could not be impeached with the underlying facts of his prior convictions, (5) failing to develop a defense that a third party killed the victim, (6) failing to call a witness to impeach a State's witness's testimony that the Petitioner never stole from the State's witness, (7) failing to request an *in camera* inspection of a State's witness's medical records, (8) failing to request a mistrial, and (9) committing cumulative errors and omissions which deprived the Petitioner of the effective assistance of counsel. After filing the petition and amended petitions, the Petitioner filed a petition for DNA testing pursuant to the Post-Conviction DNA Analysis Act. *See* T.C.A. §§ 40-30-301 to -313 (2012). He sought DNA testing of evidence from the sexual assault kit, comparison with the Petitioner's DNA, and if no match to the Petitioner's DNA occurred, he sought testing of a third person's DNA and if the DNA profile matched neither his nor the third person's DNA, he sought entry of the data into the Combined DNA Index System (CODIS). The Petitioner filed a second request for DNA testing of evidence collected from the victim's fingernail clippings, comparison with the Petitioner's DNA, and if no match to his DNA occurred, he sought testing of a third person's DNA, and if the DNA profile matched neither his nor the third person's DNA, he sought entry of the data into CODIS.

At the post-conviction hearing, Memphis Police Lieutenant Deborah Carson testified that the Petitioner was brought to the homicide office on March 14, 2010, at about 1:30 p.m. She and Sergeant Kevin Lundy entered the interview room to talk to the Petitioner around 3:15 to 3:30 p.m. She said the Petitioner might have been in a leg shackle but was not handcuffed. She said the Petitioner was advised of his *Miranda* rights and signed a waiver at 3:33 p.m.

Lieutenant Carson testified that the Petitioner gave the following statement: He knew the victim from the neighborhood but had not seen her in a while. He knew the victim by the nickname "Give Me a Dime" and said she smoked crack cocaine "now and then." He had not been to "that park" in a while. On the day the victim was killed, the Petitioner had gone to a couple of clubs, had worked until 11:00 p.m., and had walked

-2-

alone in the neighborhood. The Petitioner stated that before he went to the clubs, he had been at a store and had seen the victim but had not walked with her or another woman. He said that he stayed at the "Betty Boo" club until it closed and that when he walked out, he and a man "grabbed each other" after the man tried to snatch $20 from his hand. The Petitioner consented to giving a DNA sample, and he signed a consent form. The Petitioner stated he had not had contact with, smoked with, or had sex with the victim. He said that he never touched the victim, that his DNA would not be found, and that did not know "why people would put his name in this." Lieutenant Carson said the statement ended at 3:50 p.m.

Lieutenant Carson testified that the Petitioner gave a second statement from 4:29 to 5:05 p.m. In it, the Petitioner said: He last saw the victim about two weeks earlier. It was impossible for someone to have seen him in a park with the victim, and the person must have been mistaken about his identity. His DNA would not be on the victim, and his skin would not be under her fingernails. He would take a polygraph examination. He would not hurt a woman or kill anyone. When asked about scratches, he showed the investigators a recent scratch on his elbow and said it was from a "tussle" at a club. The scratches were not from the victim. The victim would not have tried to rob him. When asked to lift his shirt, the Petitioner showed the officers several scratches on the back of his arm and his back. He had a scratch on his face.

Lieutenant Carson testified that the Petitioner signed a written statement at 6:22 p.m. The written statement was based upon the 4:29 to 5:05 p.m. interview. After he signed the statement, the Petitioner was released and left the police department. She acknowledged that the statement included the *Miranda* rights, which she said they reviewed with the Petitioner. When asked why the written statement was designated "defendant's statement," rather than "witness statement," Lieutenant Carson said the Petitioner was a suspect when he gave the statement.

Lieutenant Carson agreed that the Petitioner was cooperative, that he was eager to tell them what he did and did not know, that he never indicated he did not want to talk to them, and that he agreed to give a DNA sample. She said they never told the Petitioner he had to stay at the police department. Although she did not recall whether she saw the Petitioner in a leg shackle, she agreed her report stated he had walked out to smoke and that he went outside to try to call someone to pick him up after giving the written statement. She said the Petitioner was not under arrest when he gave the statement. When asked if usual policy was to put a leg shackle on a person in this situation, she said, "It has happened, yes."

Memphis Police Sergeant Kevin Lundy testified that in the course of investigating the victim's homicide, the police received information that Bernard Fitch[1] had seen the victim and the Petitioner together at a store and later saw them walking in a park. Sergeant Lundy said the time Mr. Fitch stated he saw the Petitioner and the victim together corresponded with the time of death identified by the medical examiner. Sergeant Lundy said the police received information from another individual that the person heard in the neighborhood the Petitioner was responsible for the victim's homicide. He said the police received descriptions of the clothing worn by the person who was with the victim.

Sergeant Lundy testified that on March 14, 2010, he and Sergeant Mundy Quinn went to the Petitioner's mother's house and that the Petitioner's mother was evasive about the Petitioner's whereabouts. Sergeant Lundy said he and Sergeant Quinn talked to a man who said he was on his way to pick up the Petitioner. They followed the man from the Petitioner's mother's house to an apartment complex and called for an officer in a patrol car to meet them. Sergeant Lundy said none of the blue lights were activated on the police cars. Sergeant Lundy said the Petitioner walked out of an apartment wearing clothing that matched the description they received of the person seen with the victim. Sergeant Lundy called out to the Petitioner, who said, "I was just fixing to call y'all." Sergeant Lundy told the Petitioner they needed to talk to him, and the Petitioner agreed. Sergeant Lundy agreed the exchange was cordial. Sergeant Lundy said they needed the Petitioner to "go downtown" but did not recall if the Petitioner asked if they could stay and talk there. He said the Petitioner agreed to go with them. Sergeant Lundy told the Petitioner, "I have to put you in the back of this patrol car" and advised him he would need to be handcuffed consistent with department policy regarding individuals in the back of patrol cars. Sergeant Lundy said the Petitioner was patted down for weapons and although he did not specifically recall handcuffing the Petitioner, he thought the Petitioner was placed in handcuffs.

Sergeant Lundy testified that the Petitioner was taken to the homicide office, that his ankle was shackled to a stool, and that he remained in the room for one and one-half hours until he was interviewed. Sergeant Lundy said other officers offered food, coffee, and use of the restroom during the wait. During this time, Sergeant Lundy obtained a search warrant for the Petitioner's DNA. Sergeant Lundy said he and Sergeant Carson entered the room to interview the Petitioner around "[t]hree-something" p.m. He offered the Petitioner food, water, and use of the restroom. After obtaining biographical information from the Petitioner, Sergeant Lundy reviewed the *Miranda* rights form with

---

[1] During the post-conviction proceedings, the witnesses and counsel referred at various times to Bernard Fitch and to Autra Fitch. Mr. Fitch's trial testimony indicates that his name is Autra Bernard Fitch.

-4-

the Petitioner. He thought the Petitioner read the form aloud and said the Petitioner seemed to understand the rights and signed the form.

Sergeant Lundy testified that regarding the day the victim was last seen alive, the Petitioner stated the following: The Petitioner knew the victim by a nickname. He saw "them" at a store. The Petitioner had three cocaine-laced marijuana cigarettes. The Petitioner went to a bar and later returned to the store, where he saw the victim again. The Petitioner denied any sexual or other physical contact with the victim.

Sergeant Lundy testified that he asked the Petitioner for a DNA sample around 4:30 p.m., and the Petitioner "said he wouldn't mind at all." Sergeant Lundy noticed "[r]elatively fresh" scratches on the Petitioner's arms when the Petitioner removed his coat. When Sergeant Lundy asked if the Petitioner had other scratches, the Petitioner said he did and removed his shirt to reveal scratches on his back. Sergeant Lundy said the Petitioner stated the scratches occurred during a "tussle" with some men who tried to rob him.

Regarding the *Miranda* rights waiver, Sergeant Lundy thought the Petitioner read it aloud. Sergeant Lundy said the Petitioner was not questioned before being advised of his *Miranda* rights. Sergeant Lundy said the Petitioner also signed a consent form to provide a DNA sample. Sergeant Lundy said the Petitioner's written statement was titled "defendant's statement" because the Petitioner was a "potential suspect." Sergeant Lundy said the Petitioner was released after signing the statement.

When asked if the Petitioner was under arrest on March 14, 2010, Sergeant Lundy said, "I'm going to say no." Sergeant Lundy said the Petitioner came to the police department "freely."

Sergeant Lundy testified that the person who found the body, Errol Davis, was interviewed but was not a suspect. Sergeant Lundy did not know whether he was aware during the investigation that Mr. Davis had schizophrenia. Sergeant Lundy said he had read Bernard Fitch's statement before he talked to the Petitioner and agreed Mr. Fitch selected the Petitioner from a photograph lineup. Sergeant Lundy said he had reviewed Mr. Fitch's criminal history when Mr. Fitch was interviewed on March 13, 2010. Sergeant Lundy said he received information from Lawrence Goodwin, whose nickname was "Tuff," on March 13 that drug users in the neighborhood were saying a person named "Wes" or "West Coast" had been with the victim and had killed her. Mr. Goodwin told Sergeant Lundy that he knew Wes, that Wes was a crack cocaine user, and that Wes was violent when he smoked crack. Sergeant Lundy agreed the victim's daughter told him before he interviewed the Petitioner that the Petitioner had been seen wearing clothing that matched the clothing the Petitioner wore when he was questioned.

Sergeant Lundy agreed the victim's daughter also told him a neighbor named Andre saw the victim with Tuff around 3:00 p.m. on March 11.

Tennessee Bureau of Investigation (TBI) Special Agent Forensic Scientist Donna Nelson testified that she conducted DNA testing of some of the evidence in this case. She said vaginal, anal, oral, abdominal, neck and chest swabs from the victim were tested and failed to show the presence of semen. She said that if semen was not detected, TBI policy provided that DNA testing would not be conducted. She said anal, vaginal, and oral swabs still existed and could be tested for DNA. She tested the abdominal and chest swabs for DNA but did not obtain a profile due to insufficient or degraded DNA. She said that a neck swab contained female DNA but that she could not obtain a profile because the DNA was insufficient or degraded. She did not test debris found on the victim's chest for DNA, nor did she test the contents of an envelope labeled "foreign material." When asked if she tested a jacket, she said she was unaware of one having been collected. She did not conduct any testing of hair evidence because the TBI did not do hair testing. The court noted that the trial transcript reflected the jacket had not been tested. Agent Nelson said she helped Kevin Lundy package the fingernail clippings and send them to Orchid Cellmark. She agreed that she recommended further testing because she thought it would be helpful but that she did not make the same recommendation for other evidence. She agreed that for the items on which no semen was found, the likelihood of finding DNA was not high.

Regarding the abdominal, chest, and neck swabs, Agent Nelson testified that she had some untested swabs remaining after her testing. When asked if STR or YSTR DNA testing could be done on the untested samples, she said she would not do STR DNA testing on any untested samples because the testing would consume the samples and her STR testing had not revealed the presence of DNA. She acknowledged the possibility DNA might exist on the swabs, but she said she usually used the portion of a sample that was most stained.

Regarding DNA testing of the jacket, she said the TBI laboratory had never tested an entire jacket for touch DNA and said it would be an intensive process. She said that typically, only the portions of a garment that appeared to have stains or the locations where a person said he or she was touched were tested. She said that if the jacket had been recovered in an abandoned house six weeks after the offense, this would affect the DNA test results.

Memphis Police Sergeant Mundy Quinn testified that he and Sergeant Lundy spoke with the Petitioner on March 14, 2010. Sergeant Quinn said he and Sergeant Lundy went to the Petitioner's mother's house, but the Petitioner was not home. They followed a man, who told them he was going to pick up the Petitioner, to an apartment

complex. When the Petitioner emerged from an apartment, he said, "I was getting ready to call y'all." Sergeant Quinn said he and Sergeant Lundy wore their guns visibly. Sergeant Quinn said the Petitioner was taken "downtown." He did not know whether the Petitioner was searched and handcuffed but said it was departmental policy to search and handcuff a person who was put in the back of a marked patrol car. He said the person who would have knowledge would be the uniformed officer who transported the Petitioner. Sergeant Quinn said that the Petitioner was not under arrest but that the Petitioner was a person of interest in the victim's homicide. He said the Petitioner went voluntarily for the interview. He said the Petitioner was released after the interview.

Sergeant Quinn testified that at the police department, Sergeant Lundy obtained the Petitioner's DNA sample. He said that when the Petitioner was arrested in October of an unspecified year, he and Sergeant Lundy interviewed the Petitioner. Sergeant Quinn said the Petitioner was advised of his rights, read them aloud, signed a waiver, and verbally indicated his understanding. When Sergeant Quinn questioned the Petitioner about the scratches, the Petitioner stated he had been in an altercation at Betty Boo's. When the Petitioner was questioned about why his DNA was under the victim's fingernails, the Petitioner said it was impossible. Sergeant Quinn said the Petitioner denied having sex with the victim.

Eddie Jackson, the Petitioner's stepfather, testified that he and the Petitioner's mother spoke with detectives who came to their house in March 2010. He told the detectives he was going to pick up the Petitioner, and they followed him to an apartment complex. He said that the detectives were in a single car and that they did not activate blue lights. When he arrived, the Petitioner came out of an apartment, and the detectives told the Petitioner they wanted him to come with them to answer some questions. Mr. Jackson said that he did not remember exactly what happened but that the Petitioner "wound up in handcuffs." He said they had to wait for a patrol car to arrive.

Trial counsel testified that he did not file a motion to suppress. He said that he was not the original attorney but that when he received the case, the discovery information contained a police report supplement stating that when the Petitioner was approached by detectives, he told them he was getting ready to call them. He said that he asked the Petitioner about the account of the encounter in the discovery materials and that the Petitioner did not refute the information. Counsel did not recall whether he asked the Petitioner if the Petitioner had been handcuffed when the Petitioner was transported to the police department. Counsel said he always asked a client if the client asked for an attorney or told the police the client did not want to speak with them. Counsel said nothing the Petitioner said about the Petitioner's March 14, 2010 encounter with the police caused counsel any concern that warranted a motion to suppress. He said the Petitioner did not understand why he had not been cleared of suspicion after having

cooperated and having provided a DNA sample. Counsel did not recall specifically what the Petitioner said, but counsel said that generally, the Petitioner indicated he wanted to talk to the police to find out "why his name was in it" and to exonerate himself.

Trial counsel was questioned about a police report supplement that said, "Writer and Sergeant Lundy approached [the Petitioner] and he said he was getting ready to call us. Writer asked for uniform officer to make the scene and transport [the Petitioner] to the Homicide office." Counsel said he was unconcerned that an arrest or seizure occurred and again noted the Petitioner wanted to talk to the police. He said that a witness identified the Petitioner as the last person seen with the victim, that the time of death was near the time they were seen together, and that this evidence would be a valid reason for the Petitioner to be questioned. Based upon this evidence, counsel did not think a judge would have granted a motion to suppress, even if the judge determined that a detention or arrest occurred, because probable cause existed. Counsel did not think the search warrant for DNA evidence lacked probable cause.

Trial counsel testified that the Petitioner told him the Petitioner realized after he had been in jail that his statement to the police had been incorrect and that he remembered the victim's slapping his face and leaving a scratch. Counsel said they discussed that the only way for this evidence to reach the jury was if the Petitioner testified.

Trial counsel testified that he objected to the testimony of Huma Nasir, an analyst from Orchid Cellmark, because she did not collect the substance from under the victim's fingernails. He said he did not object based upon the Confrontation Clause because in his experience, chain of custody and Confrontation Clause arguments had never been successful in similar situations. He did not interview Ms. Nasir before the trial, but he talked to the TBI special agent who conducted testing. Counsel said that at the time of the September 2011 trial, he had not been aware that a Confrontation Clause challenge existed if a witness from a laboratory had not personally tested evidence. He said he did not make a hearsay objection to Ms. Nasir's testimony about the test results because he thought Ms. Nasir tested the evidence herself. He did not think a viable chain of custody objection existed relative to the evidence submitted to Orchid Cellmark.

Trial counsel testified that he did not retain a defense expert to conduct DNA and serology testing because based upon his past experience, the TBI was straightforward. He said he had a previous case in which a TBI special agent showed him the evidence, the problems with the case, and how the DNA showed that someone other than counsel's client was likely the killer. He did not think a defense expert would have helped him cross-examine the State's expert witnesses more effectively. Relative to this case, counsel said that he met with Agent Nelson for one to one and one-half hours, that she

explained the DNA would have remained under the victim's fingernails for no more than twenty-four to forty-eight hours, and that the Petitioner's DNA under the victim's fingernails indicated the Petitioner and the victim had contact within twenty-four hours. He said that although the prosecutor did not ask Agent Nelson about this point, Ms. Nasir testified about it. Counsel agreed that with regard to the items that were tested and failed to reveal the presence of semen, he did not specifically consider whether testing by a defense expert might be detrimental to the defense because it might reveal the Petitioner's DNA.

Trial counsel testified that he did not request a pretrial hearing to determine the admissibility of the Petitioner's prior convictions if the Petitioner testified. He said that typically, a judge conducted such a hearing during or immediately before a trial. Counsel said he advised the Petitioner of "what could be used against him" if the Petitioner testified. He agreed the State filed a notice of intent to impeach the Petitioner with prior convictions pursuant to Tennessee Rule of Evidence 609. Counsel said that he and the Petitioner had many discussions about whether the Petitioner would testify and that he advised the Petitioner the decision was the Petitioner's. Counsel said the Petitioner decided not to testify in order to prevent the jury from learning of the prior convictions. Counsel said he had been aware at the time of appellate cases holding that drug crimes were not probative of truthfulness, that robbery offenses were crimes of dishonesty, and that violent crimes were not necessarily probative of truthfulness. He said that if evidence of only some of the Petitioner's prior convictions were admitted, the effect would be the same as evidence of all of them. Counsel did not specifically recall whether he made clear to the Petitioner that evidence of the prior convictions was limited to the convictions and their respective dates.

Trial counsel testified the Petitioner told him that the victim wanted the Petitioner's crack cocaine but that the Petitioner did not want to give her any because she owed the Petitioner money. The Petitioner told counsel that the victim slapped him and scratched his cheek in the process and that the Petitioner did not hit her. Counsel said the Petitioner did not tell the detectives because the Petitioner "did not think much of it at the time." Counsel noted that the Petitioner's testimony would have provided an explanation about the Petitioner's DNA being under the victim's fingernails but would not have explained the scratches elsewhere on his body.

Regarding his cross-examination of Mr. Fitch, trial counsel agreed that he asked Mr. Fitch if he had a vendetta against the Petitioner, that Mr. Fitch denied accusing the Petitioner of stealing from him, and that Mr. Fitch did not think the Petitioner stole from him. Counsel agreed he would have looked at prior counsel's investigator's notes, in which the investigator stated Mr. Fitch accused the Petitioner of stealing from him. Counsel noted that when cross-examining a witness, a lawyer was able to judge the jury's

response and level of interest as it related to the lawyer's point. Counsel said that he did not think cross-examination of Mr. Fitch about his prior allegation the Petitioner stole from Mr. Fitch was working with the jury and that counsel pursued it to the extent he thought appropriate. Counsel thought the alleged theft took place years before the events of this case and did not think a person would hold a grudge that long. Regarding trial counsel's decision not to call Elizabeth Benson as a witness to testify about Mr. Fitch's inconsistent statement to her, counsel said he thought it was "a whole lot of effort" to prove a point that was not of consequence at the trial.

Trial counsel testified that he did not introduce evidence of the victim's prostitution convictions from ten or more years earlier in order to suggest she might have been killed by a client while working as a prostitute because he thought this approach would alienate the jury.

Trial counsel testified that on the advice of prior counsel, he investigated Mr. Davis, the person who found the victim's body in an obscure location. Trial counsel said he had information about Mr. Davis's schizophrenia and planned to use the information at the trial if Mr. Davis "came across as suspicious" as having committed the offense. He said, however, that Mr. Davis "came across as an older gentleman who had had a hard life" and had been collecting cans to sell for money and that he did not appear suspicious or angry. Counsel said that although he attempted to cast suspicion on Mr. Davis by inquiring about Mr. Davis's searching for cans at night, Mr. Davis explained that he had discovered the victim's body before dark, that he had walked for about one hour to get to the fire department to report what he had seen, and that the police did not arrive until one and one-half to two hours after the discovery, by which time night had fallen. Counsel said that in his opinion, the information about Mr. Davis's schizophrenia would not have had any impact on the jury's impression of Mr. Davis and would have turned the jury against himself and the Petitioner. He acknowledged he never considered issuing a subpoena for Mr. Davis's mental health records and said he thought he had "enough ammunition" in a report in his possession. Counsel said he did not ask Mr. Davis about an aggravated assault conviction from almost twenty years earlier because in his opinion, the jury would not believe Mr. Davis, who was elderly, had raped and strangled the victim. Counsel said that Mr. Davis's DNA was collected and that there was no DNA collected from the victim's body "that didn't turn out to be [the Petitioner]."

Trial counsel acknowledged his timesheet, which reflected that he visited the Petitioner in jail twice. Counsel said he saw the Petitioner on court hearing dates. Counsel said the case was "ready to be tried, essentially" when he was appointed as substitute counsel. He said his investigator met with the Petitioner and interviewed the witnesses in preparation for the trial.

Trial counsel testified that he did not request a mistrial when Sergeant Lundy testified about "people in the neighborhood" when asked why the police began focusing on the Petitioner. Counsel said he thought that objecting was sufficient and that a mistrial was not warranted. Counsel said he requested a mistrial relative to Sergeant Lundy's explanation at the trial that Sergeant Lundy did not collect a DNA specimen from another individual because "everything checked out" relative to the individual.

The Petitioner testified that he met with trial counsel twice before the trial. He said counsel prepared him for the trial and told him counsel had an investigator working on the case. The Petitioner said counsel always seemed rushed in their meetings. The Petitioner said that he had his mother call counsel to inquire about the status of the case, which prompted the second meeting. The Petitioner said that counsel never asked him about the night of the victim's death but that he discussed the night with the defense investigator. He said they never discussed obtaining a defense DNA expert, testing the evidence collected from the victim, or defense strategy.

The Petitioner testified that neither trial counsel nor the defense investigator asked him about his interaction with the police on March 14, 2010. The Petitioner said that on the morning of March 14, he was at a friend's house. He said his mother called around 9:00 to 10:00 a.m. and stated Sergeant Lundy wanted to speak with him and had left a business card with the Petitioner's mother. The Petitioner said that he waited for his stepfather, Eddie Jackson, to pick him up and that when Mr. Jackson arrived, two police officers approached the Petitioner. The Petitioner said Sergeant Lundy asked his name and told the Petitioner they needed to talk to him. The Petitioner said that he stated he had been going to call them, that he asked if they could talk there, and that Sergeant Lundy responded that he needed to take the Petitioner to the police station. The Petitioner said that he was searched, that Sergeant Lundy called for a patrol car, that the Petitioner was handcuffed, and that he was taken to the police station in the patrol car. The Petitioner said he asked the officer who transported him whether he was under arrest and that the officer told him, "[I]t's procedure." The Petitioner said he did not feel free to leave and thought he was under arrest. The Petitioner said that he did not want to go to the police station and that he wanted to talk to them where he had been. The Petitioner stated that at the police station, the officers shackled his leg to a table in the homicide department. The Petitioner said he accepted Sergeant Lundy's offer of coffee but declined the offer to go to the restroom. The Petitioner said he was left in an office alone for over an hour. He said he accepted a woman's offer of a second cup of coffee. He said he had not used drugs that day and felt clear-headed.

The Petitioner testified that eventually, Sergeant Lundy and another officer entered the room. The Petitioner said he could read and write and acknowledged the *Miranda* rights waiver form he signed. The Petitioner said Sergeant Lundy questioned

-11-

him about the victim and examined his hands and arms. The Petitioner told Sergeant Lundy about an altercation a few nights earlier, during which the Petitioner received a scratch on his back. The Petitioner said that he agreed to provide a DNA sample and that Sergeant Lundy photographed his back and face. The Petitioner acknowledged that he told Sergeant Lundy he had been with the victim for a while and that she asked for "a smoke or something." He said he denied killing the victim. He said he gave a written statement. He said that he was at the police station until about 5:00 p.m. and that when he was unable to get a ride from his stepfather, Sergeant Lundy took him where he wanted to go. The Petitioner said that as he got out of the car, Sergeant Lundy stated, "[T]he next time I see you I'm either going to shake your hand or . . . put an indictment in your face." The Petitioner said he called Sergeant Lundy the next day to provide the Petitioner's new cell phone number.

The Petitioner testified that on October 6 of an unspecified year, several police cars came to his house. He said an officer told him they needed to take him to the police station to speak to Sergeant Lundy. The Petitioner said he was handcuffed and taken to the homicide department. He said that when he asked Sergeant Quinn what was "going on", Sergeant Quinn advised him, "[T]hey got your DNA man." He said he told Sergeant Quinn he had "a little altercation" but had not mentioned it previously because he did not want the police to think he killed the victim and wanted them to find the perpetrator.

The Petitioner testified that he and trial counsel did not discuss whether the Petitioner would testify until near the end of the trial. He said counsel told him that if he testified, the prosecution could "go into [his] past" but that counsel did not explain specifically what the prosecution could and could not do. Because the Petitioner did not want the jury to know about his prior robbery convictions, he elected not to testify. He noted that his robbery conviction involved his taking a woman's purse and that his domestic violence conviction involved conduct against a girlfriend. He agreed he did not want the jury to know about additional convictions for forgery, selling drugs, and burglary. The Petitioner said he had not seen the State's "Notice of Impeachment of Convictions" until post-conviction counsel showed it to him. He said that if he had been advised the prosecution would only be allowed to ask him the names of the offenses and the dates of his convictions, he would have testified. He said counsel did not mention the possibility of requesting that the court exclude the prior convictions. The Petitioner said he had never had a trial until the present case.

Regarding the facts to which he would have testified if he had taken the stand at his trial, the Petitioner testified that around 6:00 or 7:00 p.m. on March 11, 2010, he smoked a cigarette laced with cocaine at a store. He said that the victim approached him and asked for a cigarette but that he refused. He said that a store employee told them to leave and that he went to a club across the street, where he drank with two men. He said

he eventually returned to the store. He said the victim asked him for some change, which he gave to her. He said that they stood outside the store with three other individuals and that the store employee told them to leave.

The Petitioner testified that he asked the victim if she knew someone who had "weed" and that he asked her to take him to the person she identified. He said that he saw police officers and that he gave the victim five pieces of crack cocaine to hold for him. He said that after he saw the police leave, he asked her for the crack and that she returned only four rocks. He said he tried to take the remaining rock from her hand but that she reached up and "rubbed across" his finger. He said the victim placed her hands on his face and that her fingernail hit under his eye. He said a man named "Sheller" or "Shorty" saw this and told the Petitioner he was "bigger than that." He said the victim and the man walked away together. The Petitioner said that he heard the victim ask for a lighter and that the Petitioner said, "I'm going to come back on the first you owe me twenty dollars, I'll just messing [sic] with you, you know what I'm saying, when you get your check you owe me twenty dollars." The Petitioner stated that the man and the victim walked toward a park and that he returned to the club. He said he stayed at the club until it closed around 11:00 p.m. or 12:00 a.m. and then rode to another club, Betty Boo's, with "Big Martha." He said that after drinking two beers in the club, he went outside to smoke and had an altercation with a man who tried to "snatch" twenty dollars from him when the Petitioner reached for his lighter. He said the man grabbed him by his collar and tried to pull his coat over his head. He said the man scratched his back during the altercation. The Petitioner said that he went inside the club for a while, that he and another man left, that they obtained beer and cigarettes, and that they sat in front of his mother's house until daylight.

The Petitioner acknowledged that trial counsel gave him the discovery materials. He said the documents included his *Miranda* waiver form and his pretrial statement.

The parties offered a stipulated exhibit consisting of Elizabeth Benson's defense investigative report relative to Mr. Fitch. The report includes the following: "Mr. Fitch states that in the past the defendant did steal some drugs from him but that was a long time ago and could not recall what really happen[ed]." The parties also stipulated to documents reflecting the victim's six prostitution convictions occurring in 1994 to 2001. The parties stipulated to the affidavit of complaint, the criminal information, and the judgment relative an attempted aggravated assault conviction against Errol Davis, the person who found the victim's body. The conduct that formed the basis for the conviction occurred in 1991.

The post-conviction court denied relief on the basis of ineffective assistance of counsel, and it denied the request for post-conviction DNA testing. This appeal followed.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

# I

## INEFFECTIVE ASSISTANCE OF COUNSEL

The Petitioner contends that the post-conviction court erred in denying relief on his numerous allegations of ineffective assistance of counsel. To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon

-14-

adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

## A. Failure to File a Motion to Suppress

The Petitioner contends that trial counsel was ineffective for failing to file a motion to suppress evidence as a result of police questioning and collection of DNA evidence from him on the day after the victim's body was discovered. Relative to this issue, the trial court's order denying relief states:

> The facts presented were that the Petitioner was the last person seen with the victim. Officers wanted to talk to him as a witness and left messages for him to call. When they got to a location where the Petitioner was found he indicated that he had been anticipating calling them. They asked if he would come to headquarters for an interview and he agreed. Although he was not under arrest officers advised him of his rights and he agreed to give them a statement. Officers had obtained a Search Warrant to collect DNA from Petitioner. While interviewing Petitioner, officers observed some scratches on the Petitioner's arm and they asked about them. He showed them other scratches and gave an explanation to the officers for how he obtained them. Officers asked Petitioner if he would consent to [give a] DNA sample and he agreed. After obtaining the sample and a statement from Petitioner he was taken home. Petitioner alleges trial counsel should have filed and argued a Motion to Suppress based on an illegal arrest and seizure of Petitioner without probable cause, which resulted in the DNA evidence. This Court finds no basis exist[s] for a Motion to Suppress. The Petitioner was the last person seen with the victim. He was questioned as a witness. He was not under arrest or charged for many months. (Petitioner even called officers [the] next day and gave them a new cell phone number.) Petitioner was advised of his rights and waived them. He was asked to consent to DNA samples and he agreed. There was no basis to file a Motion to Suppress. This issue has no merit.
>
> The second ground alleges that counsel should have filed a Motion to Suppress based upon the affidavit in the Search Warrant for DNA. This issue has no merit because the Petitioner consented to give a sample of his DNA. Further trial counsel said he reviewed the issues and felt there was probable cause and that defendant told him he was co-operative and trying

-15-

to exonerate himself.

Trial counsel testified that the Petitioner's statements to him about the circumstances of the police encounter on March 14, 2010, were consistent with the information in the police report and supplemental police report, which stated that the Petitioner said he was about to call the police. The Petitioner confirmed to counsel that he wanted to speak to the police. Although the Petitioner testified that counsel and the defense investigator never asked him about the March 14 police encounter, trial counsel testified that he reviewed the discovery information relative to the March 14 encounter before deciding not to file the motion. The discovery information reflected that the Petitioner spoke with the police voluntarily. Counsel said the Petitioner gave him information that was consistent with the discovery materials. Counsel said he asked the Petitioner for the Petitioner's version of the March 14 encounter. Although he could not recall exactly what the Petitioner told him, he said the Petitioner did not say anything that caused counsel to think the Petitioner had been unlawfully arrested or questioned or that the Petitioner had not wanted to speak with the police. Counsel noted that the Petitioner said he gave the police a DNA sample.

The post-conviction court's findings indicate that it credited trial counsel's testimony and that it determined counsel's performance was not deficient. The evidence does not preponderate against the court's findings in this regard.

Relative to prejudice, the Petitioner argues that had trial counsel filed a motion to suppress, the evidence pertaining to the March 14 encounter would have been excluded. The post-conviction court made factual findings regarding the Petitioner's voluntariness relative to the March 14 encounter and determined that no basis existed for suppression.

In determining whether the post-conviction court properly determined that no basis for suppression existed, we are mindful that our supreme court has defined an arrest as "'the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest.'" *State v. Ingram*, 331 S.W.3d 746, 757 (Tenn. 2011) (quoting *West v. State*, 425 S.W.2d 602, 605 (Tenn. 1968)). The United States Supreme Court has said that in resolving whether a person is under arrest, the court should consider the totality of the circumstances and consider "how a reasonable man in the suspect's position would have understood his situation." *State v. Anderson*, 937 S.W.2d 851, 854 (Tenn. 1996) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)).

> Some factors relevant to that objective assessment include the time and location of the interrogation; the duration and character of the questioning;

the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id.* at 855.

By all accounts, the Petitioner told the police officers he was about to call them. The Petitioner testified that he thought he was under arrest when he was handcuffed and transported to the police department, although he acknowledged he was advised that police procedure dictated handcuffing individuals being transported in police vehicles. The evidence showed that a leg restraint was or may have been used on the Petitioner at the police department but that he had not been placed under arrest. The Petitioner was advised of his *Miranda* rights and indicated his willingness to speak to the officers. After he provided the statement and the DNA sample, the Petitioner was released, and Sergeant Lundy took him to the Petitioner's desired destination. The Petitioner called the police the next day to provide his new cell phone number. He was not charged criminally for months after making the statement and providing the DNA sample.

The totality of the proof shows that a reasonable person in the Petitioner's position would not think he was under arrest. From the beginning of the encounter, the Petitioner indicated his desire to talk to the police and accompanied them voluntarily to the police department. Although he was handcuffed before being transported in a police car, he was advised this was standard procedure. The proof likewise shows that the Petitioner cooperated at the police department because he thought he could clear his name relative to the victim's death. Trial counsel reviewed the discovery information and gathered information from the Petitioner, and he had no concerns that would have prompted his filing a motion to suppress. Upon review, we conclude that the post-conviction court's findings support its determination that no basis existed for suppression of the evidence from the March 14 encounter and that the Petitioner failed to show prejudice from counsel's failure to raise a suppression issue.

Because Petitioner failed to establish deficient performance and prejudice, the post-conviction court did not err in determining that the Petitioner failed to show ineffective assistance of counsel for failing to file a motion to suppress. The Petitioner is

not entitled to relief on this basis.

## B. <u>Failure to Object to DNA Expert's Report and Testimony</u>

The Petitioner contends that trial counsel was ineffective for failing to object to the State's DNA expert's report and testimony as inadmissible hearsay and as violating the Confrontation Clause. *See* U.S. Const. Amends. VI, XIV; *Bullcoming v. New Mexico*, 564 U.S. 647 (2011) (holding that the Confrontation Clause provided a criminal defendant with the right to confront an analyst who conducted a blood alcohol analysis before testimonial report authored by the analyst could be received as evidence); Tenn. R. Evid. 801(c) (defining hearsay), 802 (providing that unless otherwise provided by rule or law, hearsay evidence is inadmissible). He argues that the expert who testified and prepared the report did not conduct the DNA testing, based upon her testimony that "we" performed the analysis. The Petitioner also contends that because the witness was located in another state, "present counsel needed the post-conviction court's cooperation in bringing the witness to Tennessee." In that regard, he contends that the post-conviction court erred in denying his request for funding to bring the witness to Tennessee to testify.

The trial transcript, which was an exhibit at the post-conviction hearing, reflects that Huma Nasir, an employee of Orchid Cellmark, testified as an expert in DNA analysis. The victim's fingernail clippings and extracts from the victim's and the Petitioner's DNA samples were submitted to Orchid Cellmark for analysis. The transcript reflects that trial counsel objected to a question about visual examination of the material under the victim's fingernails because Ms. Nasir had not personally observed the clippings and that the trial court sustained the objection. She testified that she did not conduct swabbing of the clippings to collect DNA evidence but that she supervised the person who did. With regard to the analysis and comparison, which showed that the Petitioner's DNA was under the victim's fingernails, she stated that "we," not "I," conducted the analysis.

At the post-conviction hearing, which was conducted over multiple dates, post-conviction counsel stated that he wanted to talk to Ms. Nasir "one more time . . . to get it straight in my mind exactly what she did." Counsel stated he wanted, at some point, to "get something in this record from Ms. Nasir . . . making it clear exactly what she did, what her role was in this DNA testing." Counsel stated that based upon a telephone conversation he had with Ms. Nasir, he thought he had a "good faith basis to try to develop this some more." He said he thought she had not conducted "every single step" of the testing but wanted to clarify her role. He said his understanding was that a team approach was used for the testing and that her trial testimony was consistent with his understanding. When asked by the post-conviction court if counsel proposed that Ms.

Nasir be flown to Tennessee to provide evidence, counsel stated that she might provide evidence by telephone in a "deposition-type situation." The court ruled that it would not authorize funding for Ms. Nasir to travel to Tennessee but that its order did not prohibit counsel from speaking with Ms. Nasir by telephone and conferring with the prosecutor and "doing whatever you choose to do."

When the post-conviction hearing reconvened over one month later, post-conviction counsel again raised the issue of calling Ms. Nasir as a post-conviction witness. He stated he wanted her testimony on the record to establish whether she personally conducted the DNA testing about which she testified at the trial and to establish whether all of the evidence from under the victim's fingernails that might contain DNA had been consumed during the previous DNA testing. Counsel stated that although he had attempted to schedule a telephone conference with Ms. Nasir the previous week, they had not been able to coordinate their schedules. Counsel did not specifically request funding for a telephone deposition other than to mention it as a possible alternative to live testimony.

The prosecutor stated:

> Judge, just for the record, there are other people in the chain of custody. They moved this sample from machine to machine to get it to the point – this is all machine work. Not people doing testing, people picking up a vial and putting it in a machine that spins it around and then picking it up and putting it in another machine.
>
> But the end result, which is all that was analyzed by anyone or tested by anyone, Ms. Nasir did. There's no testing, apart from a machine, other than what Ms. Nasir did.

The post-conviction court denied the request for funding to have Ms. Nasir transported to Tennessee to testify at the hearing. The judge said, "I'm satisfied from what I read in the transcript and from what I'm being told that this was the lady that did the testing and wrote the report." Relative to the ineffective assistance of counsel aspect of this issue, the order denying relief states:

> The third allegation deals with the report from the DNA expert. She testified to her findings identifying the petitioner's DNA. She prepared a report which was marked as an exhibit to her testimony. The petitioner argues confrontation issues. This Court finds no confrontation issues. The technician who conducted the test and prepared the report was present, testified and was confronted and cross examined. This issue has no merit.

The next issue is that the expert's testimony was hearsay. This Court finds this issue to have no merit. She testified to her test, her test results and her findings. If the report itself was hearsay and this court does not find that[,] it was at worst harmless error because it merely documented her testimony.

At the post-conviction hearing, trial counsel admitted that at the time of the trial, he had been unaware of the *Bullcoming* decision, which was decided at the time of the Petitioner's trial. Counsel's failure to object, however, can only be meaningful if a valid basis for the objection existed.

Although the Petitioner contends that Ms. Nasir's testimony using the word "we" to identify who conducted the testing indicated she did not conduct all of the testing herself, the post-conviction court disagreed. Post-conviction counsel indicated he had been able to contact Ms. Nasir, but he offered no proof she did not conduct the testing aside from his own assertion that after speaking with her, he thought she might not have but needed to speak with her for further clarification. Although the post-conviction court denied a request for funding to bring Ms. Nasir to Tennessee to testify, counsel was not precluded from offering an affidavit from Ms. Nasir to support the claim or his own affidavit after speaking with her further and obtaining clarification in order to support his request for funding. In fact, the record does not reflect that counsel ever spoke with Ms. Nasir after their initial conversation. The prosecutor indicated that the testing process was mechanized and that Ms. Nasir was the only person involved in the analytical portion of the testing. The Petitioner failed to prove by clear and convincing evidence that Ms. Nasir did not conduct the testing personally, meaning no confrontation or hearsay issues existed. Because no basis for objection to the DNA expert's testimony was shown, trial counsel cannot be said to have performed deficiently, and no prejudice occurred.

We turn to the Petitioner's contention that the post-conviction court erred in denying funds for Ms. Nasir to travel to Tennessee to testify. The Petitioner has not cited any authority for the proposition that an indigent Petitioner in a non-capital case is entitled to State funding of travel expenses for a witness to testify at the post-conviction hearing. We note the well-established law in Tennessee that as a general proposition, a non-capital post-conviction petitioner is not entitled to State-funded expert assistance. *Davis v. State*, 912 S.W.2d 689, 696-97 (Tenn. 1995).

We acknowledge that by statute, an indigent petitioner convicted of certain offenses, including first degree murder, may petition the court for DNA analysis conducted at State expense pursuant to the Post-Conviction DNA Analysis Act. *See* T.C.A. §§ 40-30-301 to -313. We likewise acknowledge that the Petitioner filed a

petition seeking DNA testing pursuant to the Act. The present issue, however, relates to his request for Ms. Nasir to testify in support of his allegations regarding trial counsel's performance in failing to object to alleged confrontation clause and hearsay violations, not to DNA testing.

The post-conviction court did not err in determining that the Petitioner is not entitled to relief on this basis.

### C. <u>Failure to Retain a Defense DNA Expert</u>

The Petitioner contends that trial counsel was ineffective for failing to retain a defense DNA expert. He argues that an expert could have (1) helped counsel better cross-examine Agent Nelson and Ms. Nasir, (2) conducted forensic testing on swabs containing biological evidence from the victim's body, the victim's fingernails, debris from the victim's chest, other items in the rape kit, and the victim's jacket, (3) compared the Petitioner's DNA to any DNA found in the samples, and (4) placed the profile obtained from the samples in the CODIS database in order to determine whether the CODIS database contained a matching profile. The Petitioner contends the outcome of his trial would have been different with the assistance of a defense expert because the expert could have helped cast doubt on the State's proof and could have discovered any DNA belonging to someone other than the Petitioner.

Relative to this issue, the post-conviction court's order states:

> Counsel is attacked for failing to hire a defense DNA expert. He testified that he thoroughly interviewed the TBI expert. He felt it was unbiased and saw no problem with the procedures. Further, if his expert confirmed the DNA results it would hurt his case. He also testified that the State's experts were co-operative with him and explained everything to his satisfaction and that an expert technical advisor was not necessary. Finally, there was no DNA to test on any of the swabs so there was no need to have a second test that might implicate his client. This issue has no merit. Likewise, there was no DNA recovered from any of the swabs so there was nothing to compare. That also applies to the issue raised about not developing a profile for one of the witnesses. There was no DNA recovered on any swab or area of the body with the exception of the fingernails, so there was nothing to compare. The DNA under her fingernails belonged to the Petitioner. There was no mystery DNA to research.
>
> . . . .

-21-

In a supplement to the amended petition the allegations are that counsel was deficient for failing to have an independent DNA expert place any DNA results he may have found in the CODIS system. There was no DNA recovered on any swabs taken from the victim. There was no "mystery" DNA. This is mere speculation and has no merit.

"To succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness as the post-conviction hearing." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (citing *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The Petitioner acknowledges that he did not present expert proof to support his claim at the post-conviction hearing but argues that prejudice should be presumed due to the gravity of the error.

We note trial counsel's testimony that he did not retain a defense DNA expert because in his experience, the TBI forensic scientists were straightforward and helpful. He consulted with Agent Nelson for one to one and one-half hours and reviewed the evidence. The post-conviction court credited counsel's testimony in this regard. We note that the Petitioner has not identified any specific points about which a defense expert could have helped counsel better cross-examine Agent Nelson and Ms. Nasir.

We note Agent Nelson's testimony that after testing some of the evidence, she selected items for further testing, to the extent she thought it would be helpful. DNA matching the Petitioner's DNA profile was found on some items. Agent Nelson said that vaginal, anal, oral, abdominal, neck, and chest swabs did not contain semen and that the likelihood of obtaining a DNA profile from items that did not contain semen was low. She said that although untested anal, vaginal, and oral swabs remained, she generally used the portions of samples that were most stained in order to have the greatest probability of obtaining a DNA profile. Relative to the untested jacket, she said that the results would be affected if the jacket had been recovered in an abandoned house six weeks after the offense and that testing the entire jacket would have been an intensive process.

Significantly, the DNA testing which was conducted revealed the presence of the Petitioner's DNA. To the extent that further DNA testing could be done, the possibility exists that any results that could be obtained would confirm the results of the testing conducted at the State's direction. Likewise, the Petitioner offered no proof that defense DNA testing would have revealed favorable evidence.

The DNA testing which was conducted failed to reveal the presence of any third-party DNA profile which could be placed in the CODIS database. The Petitioner offered

no proof that any third-party DNA existed. *See id.* We acknowledge that the Petitioner requested funding for DNA testing and consultation and that the post-conviction court denied the request. We address the court's ruling in this regard in Section II of this opinion.

With regard to trial counsel's failure to retain a defense DNA expert, the post-conviction court determined that the Petitioner failed to prove deficient performance and prejudice, and the evidence does not preponderate against its conclusions. The Petitioner is not entitled to relief on this basis.

### D. Inadequate Advice About Impeachment with Prior Convictions

The Petitioner contends that trial counsel provided ineffective assistance by failing to advise the Petitioner he could not be impeached with the underlying facts of his prior convictions. Relative to this issue, the post-conviction court's order states:

> The next issue deals with whether the Petitioner wanted to testify on issues regarding his record. Counsel testified that he discussed with the Petitioner his record and what was and was not admissible. The Petitioner did not want to testify and allow his record before the jury. Counsel was satisfied as was the Court that Petitioner understood his rights regarding testifying. These issues have no merits.

The Petitioner's argument invites this court to revisit the question of witness credibility. He notes that counsel testified he thought he and the Petitioner discussed the State's limitation in not being able to ask the Petitioner about the facts of his underlying convictions, whereas he testified that they did not discuss it. The post-conviction court's ruling indicates it credited counsel's testimony over that of the Petitioner.

Relative to the question of prejudice, we note that had the Petitioner testified at the trial that he received scratches in an altercation with the victim over crack cocaine, he could have been impeached not only with the existence of the prior convictions, but also with the proof he lied initially to the police about the origin of the scratches on his body and only admitted he had been scratched by the victim after he was confronted with the DNA test results. The Petitioner also testified at the hearing that he could have said he saw the victim walking with another person after their altercation. The Petitioner acknowledged prior convictions for robbery, domestic violence, forgery, selling drugs, and burglary. In view of the significant impeachment evidence available to the State, the value of the Petitioner's testimony is questionable, at best.

The post-conviction court concluded that the Petitioner failed to offer clear and

-23-

convincing evidence to support his claim and was not entitled to relief. Upon review, we conclude that the evidence supports the court's determinations that the Petitioner failed to show that counsel's performance was deficient and that the Petitioner suffered prejudice. The Petitioner is not entitled to relief on this basis.

## E. Failure to Develop a Third-Party Defense

The Petitioner contends that trial counsel was ineffective because he failed to develop a defense suggesting that a third party killed the victim. Relative to this issue, the post-conviction court's order states:

> The next allegation attacks counsel for not developing a third party defense theory by putting on proof to show that twenty years ago the victim had been convicted of prostitution. Therefore she could have been engaging in prostitution the night of the murder. Trial counsel testified that there was no basis to raise the issue and that he felt in the eyes of the jury it would be offensive to attack the victim with ten to twenty year old convictions. This was trial strategy and should not be a basis for relief.
>
> Likewise, this Court does not feel it was ineffective for trial Counsel [not] to have pursued a line of questioning regarding the post psychological problems of the witness who found the body. There was no basis to pursue a line of questioning that the witness who testified to finding the body and then to the effort he made to contact authorities was delusional at the time and could have killed the victim. This issue has no merit and is beyond mere speculation.
>
> . . . .
>
> Next the Petitioner alleges trial counsel should have cross examined the witness who found the body about a twenty year old conviction to show that this man was violent. There is no basis to pursue this line of questioning which was not admissible. This issue has no merit.

This issue relates to trial counsel's decision not to employ a defense theory that Errol Davis killed the victim. The Petitioner argues that counsel should have presented proof of Mr. Davis's schizophrenia and that counsel should have asked Mr. Davis about a prior conviction. The Petitioner also argues that counsel should have presented proof of the victim's prostitution convictions in order to suggest that the victim was engaging in prostitution and was killed by a customer. Counsel testified that he was aware of Mr. Davis's schizophrenia but that after evaluating Mr. Davis's testimony, counsel made a

-24-

strategic decision not to cross-examine him about the diagnosis because Mr. Davis was elderly and seemed "genuine" that he had been looking for cans when he found the victim's body. Counsel also thought mentioning the diagnosis would alienate the jury. Counsel testified that although he had been aware of Mr. Davis's criminal record, he did not ask Mr. Davis about a nineteen-year-old aggravated assault conviction. Counsel testified he chose not to present evidence of the victim's prior prostitution convictions because he thought it would alienate the jury. The record reflects that the victim had six prostitution convictions occurring in 1994 through 2001 and that the Petitioner's trial took place in 2011. We note that with regard to the tested items, the DNA found on the victim matched that of the Petitioner.

The post-conviction court's findings reflect that it viewed trial counsel's decisions regarding this evidence as a matter of sound trial strategy. Strategic decisions which are based upon adequate preparation may not be second-guessed. *Pylant*, 263 S.W.3d at 874; *Adkins*, 911 S.W.2d at 347; *Cooper*, 847 S.W.2d at 528. The evidence does not preponderate against the court's determination. The Petitioner is not entitled to relief on this basis.

## F. Failure to Call Impeachment Witness

The Petitioner contends that trial counsel was ineffective for failing to call the defense investigator as a witness to impeach Mr. Fitch's testimony that the Petitioner never stole from him. Relative to this issue, the post-conviction court's order states:

> The next allegation deals with the failure of counsel to put on an investigator to impeach a witness. The witness was the last person to see the victim and petitioner together prior to victim's murder. He was cross examined about ever accusing the petitioner of stealing from him. He denied the claim. The investigator would have testified that the witness told her that years before the Petitioner stole some drugs from the witness. After asking the witness the question, counsel testified that he did not think pursuing the issue was going to be helpful to his case and that he did not see any motive for the witness to be lying. Using his judgment he chose not to pursue that issue further. This issue has [no] merit.

On cross-examination at the trial, trial counsel asked Mr. Fitch if he had a grudge against the Petitioner, which Mr. Fitch denied. Counsel asked if Mr. Fitch had ever accused the Petitioner of stealing from him, and Mr. Fitch denied he had. Counsel then asked if Mr. Fitch had accused the Petitioner of stealing marijuana from Mr. Fitch. Mr. Fitch responded that he never accused the Petitioner or thought the Petitioner had stolen from him.

-25-

The Petitioner argues that trial counsel should have called the defense investigator, to whom Mr. Fitch made a pretrial statement that the Petitioner had stolen drugs from him. The Petitioner theorizes that proof Mr. Fitch had testified untruthfully would have resulted in an acquittal because it would have caused the jury to believe Mr. Fitch testified that he had seen the victim and the Petitioner together in the park on the night of her death in retaliation for the Petitioner's having stolen drugs from Mr. Fitch.

Trial counsel testified that he had been aware of Mr. Fitch's statement to the defense investigator, that he evaluated Mr. Fitch's testimony and demeanor, that he cross-examined Mr. Fitch about the alleged prior theft, that he did not think his cross-examination of Mr. Fitch was impactful on the jury, and that, in his judgment, calling the defense investigator to testify about Mr. Fitch's prior inconsistent statement would not have been of benefit. Counsel noted that the alleged theft took place years earlier and said he did not think a person would hold a grudge that long. Counsel's testimony reflects that he considered the issue and made a strategic decision not to pursue the matter further.

In addition to trial counsel's testimony that the jury did not seem impressed by the cross-examination about the alleged theft, we note relative to the question of prejudice that the Petitioner admitted he had been with the victim on the night of her death and that they went to look for a drug dealer, although he claimed the victim and the drug dealer walked toward the park together. The Petitioner has not explained how, given the evidence he had been with the victim near the park on the night of the offense, counsel's failure to present the defense investigator's testimony was prejudicial.

The post-conviction court determined that the Petitioner failed to prove deficient performance and prejudice. The evidence does not preponderate against the court's determination. The Petitioner is not entitled to relief on this basis.

### G. Failure to Request *In Camera* Inspection of Medical or Psychiatric Records

The Petitioner contends that trial counsel was ineffective because he failed to request an *in camera* inspection of Mr. Davis's medical or psychiatric records for exculpatory evidence, given Mr. Davis's history of schizophrenia. The Petitioner also contends that the post-conviction court erred in failing to obtain and review the records as part of its consideration in the post-conviction case. The post-conviction court's order does not address directly the failure to request an *in camera* review, but the following findings and conclusion are relevant:

Likewise, this Court does not feel it was ineffective for trial Counsel

-26-

[not] to have pursued a line of questioning regarding the post psychological problems of the witness who found the body. There was no basis to pursue a line of questioning that the witness who testified to finding the body and then to the effort he made to contact authorities was delusional at the time and could have killed the victim. This issue has no merit and is beyond mere speculation.

The Petitioner's argument is based upon speculation that Mr. Davis's medical records might have contained exculpatory material that could have assisted the defense in presenting a theory that someone other than the Petitioner killed the victim. We note that the Petitioner does not contend that trial counsel failed to discover the fact of Mr. Davis's schizophrenia. Counsel testified that he was aware of Mr. Davis's schizophrenia and that he made a strategic decision not to present evidence of the diagnosis because he thought doing so would alienate the jury. Counsel also testified that he thought Mr. Davis was a credible witness who was merely collecting cans when he found the victim's body. Counsel noted that Mr. Davis was elderly and that Mr. Davis promptly reported his discovery to the authorities. Counsel made an informed, strategic decision not to present proof of Mr. Davis's schizophrenia after evaluating Mr. Davis's direct examination testimony and demeanor. No evidence suggests that counsel was deficient for failing to request *in camera* review of Mr. Davis's medical or psychiatric records.

The Petitioner acknowledges that he failed to demonstrate prejudice at the post-conviction hearing, but he alleges that the post-conviction court erred by declining his request that the court subpoena the records and conduct an *in camera* review of them in order to determine whether any evidence existed to support this post-conviction claim. We note that the Petitioner's post-conviction counsel made this request during his closing argument at the hearing. Although the Petitioner has cited cases discussing a trial court's *in camera* review of a witness's psychiatric records for evidence that may be helpful to the defense in conviction proceedings, he has cited no authority which compels a post-conviction court to obtain and review *in camera* the psychiatric or medical records of a witness from the conviction proceedings in order to prove trial counsel's ineffectiveness. We note, again, counsel's evaluation of Mr. Davis as a credible witness. We likewise note that the defense was afforded the opportunity to cross-examine Mr. Davis at the trial. No evidence suggests that *in camera* review of medical and psychiatric records would have yielded any information that would have assisted the defense at the trial or that the absence of an *in camera* review somehow deprived the Petitioner of his confrontation rights, such that counsel could be said to have been ineffective. *See* U.S. Const. Amend. VI (providing a criminal defendant the right to confront adverse witnesses); Tenn. Const. art. I, § 9.

As the post-conviction court noted, the Petitioner's argument relative to this issue

-27-

was based upon speculation. The Petitioner failed to prove deficient performance or prejudice, and the evidence does not preponderate against the court's determinations in this regard. The Petitioner is not entitled to relief on this basis.

## H. Failure to Request a Mistrial

The Petitioner contends that trial counsel was ineffective for failing to request a mistrial on two occasions during Sergeant Lundy's testimony. The first relates to Sergeant Lundy's response when he was asked how the Petitioner was developed as a suspect, to which he replied, "Some people in the neighborhood said that he was seen with the -," at which point trial counsel objected. Sergeant Lundy then testified that the Petitioner was developed as a suspect after Mr. Fitch said he saw the victim and the Petitioner together at a store, walking toward a park, and going into the park together. The second instance in which the Petitioner contends trial counsel should have requested a mistrial relates to Sergeant Lundy's response during redirect examination when asked why he did not obtain a DNA sample from Mr. Fitch, to which Sergeant Lundy responded that he was able to verify everything Mr. Fitch told him. Relative to the failure to request a mistrial, the post-conviction court's order states:

> The next two grounds have to do with counsel's failure to request a mistrial after two hearsay statements. The first statement was sustained as hearsay and rephrased. Although, there was no objection to the second statement the proof came in [through] another witness. The witness who was the subject of the hearsay objection testified that he saw the victim and defendant together the night of the murder. That testimony had already been presented to the jury by the declarant before the officers testified to the hearsay. Any error was harmless and certainly not a basis for a mistrial. Neither issue has any merit.

Trial counsel testified that he did not request a mistrial in either instance because he did not think a mistrial was required. A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981).

With regard to the first instance, the Petitioner argues that trial counsel's failure to request a mistrial in response to the testimony about "some people in the neighborhood" resulted in the State's case being bolstered by proof that individuals other than Mr. Fitch had seen the victim and the Petitioner together. Counsel testified that he thought Sergeant Lundy's subsequent testimony clarified that "some people" referred to Mr. Fitch exclusively. The record reflects that after the "some people" testimony, counsel promptly

made a hearsay objection, which resulted in the court directing the prosecutor to ask Sergeant Lundy whether he spoke with Mr. Fitch. When Sergeant Lundy responded that he had, the prosecutor asked if Mr. Fitch told Sergeant Lundy anything which caused Sergeant Lundy to "bring [the Petitioner] in." Sergeant Lundy responded, "He said that he last saw [the Petitioner] and the victim at the store which is up the street from the park sitting on the side of the store and he saw them walking toward the park and also going into the park." Regarding the second instance of Sergeant Lundy's testimony, he said he did not collect a DNA sample from Mr. Fitch because Mr. Fitch said he had not been with the victim and because Sergeant Lundy said he was able to verify the information Mr. Fitch told him.

The Petitioner argues that a mistrial was necessary because the State elicited the testimony, the trial court did not give a curative instruction, and the State's case was circumstantial. He argues that Sergeant Lundy's testimony in both instances created the impression that people other than Mr. Fitch saw the victim and the Petitioner together. As the post-conviction court noted, trial counsel made a hearsay objection relative to the first instance, which the court sustained. Counsel testified that he did not think a mistrial was required. In the overall context of the trial and in view of the DNA and other evidence against the Petitioner, any inference that the jury may have drawn that more than one person saw the victim and the Petitioner together was inconsequential. In addition to Mr. Fitch's testimony he saw the victim and the Petitioner together, the Petitioner initially lied to the police about being with the victim and about the origin of scratches on his body, and DNA that matched his DNA profile was found under the victim's fingernails. The post-conviction court determined that no manifest necessity for a mistrial existed. Upon review, we conclude that the evidence does not preponderate against the court's determinations. Without a manifest necessity for a mistrial, counsel cannot be said to have been deficient in failing to request a mistrial, and prejudice cannot be said to have occurred from counsel's lack of a request. The Petitioner is not entitled to relief on this basis.

## I. Cumulative Errors and Omissions

The Petitioner contends that the cumulative effect of trial counsel's errors and omissions constituted ineffective assistance of counsel requiring post-conviction relief. The post-conviction court determined that the Petitioner failed to show any shortcomings of counsel constituting ineffective assistance. In denying relief, the court's order states:

> This case was clearly based on circumstantial evidence. Although, a witness placed Petitioner with the victim hours before the murder, the chief proof in the case was the DNA evidence. The Petitioner lied to [a] police investigator originally about his contact with the victim and the source of

scratches on his body. His DNA was recovered from under the fingernails of the victim. The proof was circumstantial but strong. Trial counsel is a very experienced and well seasoned veteran of trials and especially murder trials. This court did not observe during the course of the case, the trial or post conviction hearings anything that would justify granting the Petitioner a new trial. Further, this court is of the opinion that the Petitioner received effective assistance of counsel before and during trial as was guaranteed under the law. This Petition for Post Conviction relief is not well taken and should be Denied.

"The cumulative error doctrine exists to protect a criminal defendant's state and federal constitutional right to a fair trial." *State v. Herron*, 461 S.W.3d 890, 909 (Tenn. 2015) (citing *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010)).

The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

*Hester*, 324 S.W.3d at 76. This court applies cumulative error analysis when two or more errors existed during the trial court proceedings. *Id*. at 77.

The post-conviction court determined that the Petitioner failed to prove any of his allegations of ineffective assistance of counsel. Because we have determined that the court did not err in this regard, no errors exist to support a determination that cumulative instances of ineffective assistance of counsel require a new trial.

## II

## DENIAL OF DNA EXPERT AND TESTING

The Petitioner contends that the post-conviction court erred in denying his request for funding for a DNA expert to assist in his post-conviction claim and his request for DNA testing of the evidence. The court's order regarding these issues states:

After a review of the facts of this case, this Court finds that a reasonable probability does not exist that an analysis of the evidence would produce DNA results that would have rendered the Petitioner's verdict more favorable if the results . . . would have been available at trial. The DNA evidence was recovered under the fingernails of the victim and the

Petitioner had fresh scratch marks on his body. He was also the last person seen with the victim, before her murder and he lied about his relationship with her and the source of his scratches. Second, the Court is not satisfied that there exists enough evidence to test. Third, the evidence has been subjected to DNA analysis identifying the Petitioner. All other swabs tested did not reveal the presence of DNA. For the above reasons the Court feels the application is simply a delaying process and will not show the Petitioner's innocence.

In a supplement the Petitioner further alleges that the [fingernail] clippings should be further reviewed to search for another profile other than Petitioner could have led to an acquittal. Again the only suspect in the case, the Petitioner lied about details in the case and had fresh scratch marks consistent with his DNA being under the victim's fingernails.

This Court finds that the [petition] for DNA testing pursuant to the "Post Conviction DNA Analysis Act" is not well taken and should be Denied.

Regarding funding for a post-conviction expert, the Petitioner aptly acknowledges Tennessee Supreme Court Rule 13, § 5(a)(2), which provides, "In non-capital post-conviction proceedings, funding for investigative, expert, or other similar services shall not be authorized or approved. *See Davis v. State*, 912 S.W.2d 689 (Tenn. 1995)." He argues, however, that the rule is unconstitutional because it violates his right to due process, notwithstanding the holding of *Davis* that no constitutional guarantee exists in this context. *See id.* at 696-97. As an intermediate appellate court, we are bound by the decisions of the Tennessee Supreme Court and, in the case of questions of federal constitutional law, the United States Supreme Court. *See, e.g. Barger v. Brock*, 535 S.W.2d 337, 340 (Tenn. 1976).

We turn to the post-conviction court's denial of the Petitioner's request for DNA testing pursuant to the Post-Conviction DNA Analysis Act of 2001. The Act provides that persons convicted of first-degree murder, among other offenses,

may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence.

T.C.A. § 40-30-303 (2012).   The Act further provides that if certain factors exist, testing shall be mandatory:

> After notice to the prosecution and an opportunity to respond, the court shall order DNA analysis if it finds that:
>
> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;
>
> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;
>
> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and
>
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

*Id.* § 40-30-304.   The court must find that all of these elements exist as a prerequisite to ordering testing.  *Powers v. State*, 343 S.W.3d 36, 48 (Tenn. 2011).

> In other instances, testing is discretionary, provided the following factors exist:
>
> (1) A reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction;
>
> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;
>
> (3) The evidence was never previously subjected to DNA analysis, or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and
>
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

-32-

T.C.A. § 40-30-305 (2012); *see Powers*, 343 S.W.3d at 48 (providing that all four factors must exist as a prerequisite to testing pursuant to section 40-30-305).

The Petitioner contends that testing was appropriate pursuant to both Code sections 40-30-304 and 40-30-305, but he has limited the discussion in his brief to the factors relevant to section 40-30-304. We will confine our review to consideration of mandatory DNA testing pursuant to section 40-30-304. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument . . . will be treated as waived in this court.").

A post-conviction court is afforded considerable discretion in its determination of whether to grant relief pursuant to the Act. *See Dwight Blake v. State*, No. M2007-00558-CCA-R3-PC, 2007 WL 4357852, at *2 (Tenn. Crim. App. Dec. 10, 2007). The court's determination may be reversed only if it is not supported by substantial evidence. *Willie Tom Ensley v. State*, No. M2002-01609-CCA-R3-PC, 2003 WL 1868647, at *4, n.2 (Tenn. Crim. App. Apr. 11, 2003); *see State v. Hollingsworth*, 647 S.W.2d 937, 938 (Tenn. 1983) (stating that in matters entrusted to the discretion of the trial court, "the appellate court is not authorized to substitute its judgment for that of the trial court when the judgment of the trial court is supported by substantial evidence").

We turn to the factors the Petitioner must establish in order to obtain DNA testing pursuant to the Act. He argues that a reasonable probability exists he "would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis" because testing could have revealed exculpatory evidence. *See* T.C.A. § 40-30-304(1). Specifically, he argues that the trial court should have ordered testing of the following items:

1.     The victim's fingernail clippings;

2.     Vaginal, anal, oral, abdominal, chest, neck swabs collected from the victim;

3.     Debris from the victim's chest;

4.     The victim's jacket;

5.     Items from the rape kit, including the victim's plucked and combed pubic hair samples and her plucked head hair sample;

6.     "Foreign material" in an envelope in the rape kit.

The Petitioner notes the significance of the DNA evidence to the State's case at trial and argues that a reasonable probability of acquittal would exist if evidence of a third person's DNA were determined to be on the victim's body.

"Under section 40-30-304(1) . . . prior to a mandatory order of testing, a petitioner's argument must merely establish 'a probability sufficient to undermine confidence' in the decision to prosecute or in the conviction had the State or the jury known of exculpatory DNA testing results." *Powers*, 343 S.W.3d at 55. The court must presume that DNA analysis will be favorable to the petitioner. *Id.* In making its determination, the court must consider the evidence presented at the trial and view the evidence in the light exculpatory DNA evidence would have had on the finder of fact or the State. *Id.* The analysis must focus on the strength of the DNA evidence as compared to the evidence presented at trial – that is, the way in which "'the particular evidence of innocence interacts with the evidence of guilt.'" *Id.* at 56 (quoting Brandon L. Garrett, *Claiming Innocence*, 92 Minn. L. Rev. 1629, 1646 (2008)).

The post-conviction court determined that, in view of the evidence at the trial, no reasonable probability of a more favorable outcome existed, even if DNA testing revealed exculpatory evidence. As we have stated previously, the Petitioner lied to the police about his being with the victim on the night of her death and about the source of scratches on his body. He admitted the victim had scratched him only after he was confronted with the DNA evidence, which matched his DNA profile. He was the last person seen with the victim on the night of her death. The trial proof showed that her time of death was around the time she was last seen with the Petitioner. The evidence supports the post-conviction court's determination that no reasonable probability of a more favorable outcome existed.

Although the Petitioner's failure to prove the first factor is determinative, we will review the post-conviction court's findings relative to the remaining factors. Relative to the victim's fingernail clippings, the transcript of the trial reflects that Ms. Nasir testified, "[W]e collected all the cells or all the materials that was under those fingernails for testing. . . . At that point, that material has been extracted and then we perform DNA testing[.]" Notwithstanding her testimony that all of the material had been extracted and tested, the Petitioner relies upon his post-conviction counsel's statement to the court at the hearing relative to the material Orchid Cellmark extracted from the fingernails, "[M]y memory of [a telephone call with Ms. Nasir] is there might still be something left there [for testing]." Because Ms. Nasir's sworn testimony indicates all of the material was tested, the post-conviction court did not err in determining that the Petitioner failed to show testable evidence existed as to the fingernail evidence.

-34-

Regarding the evidence from the swabs of the victim's body, the Petitioner argues that although testing of the swabs of the victim's body did not reveal the presence of semen, Y-STR testing of the remaining swabs might reveal the presence of male DNA from someone other than the Petitioner. We acknowledge the evidence that Y-STR DNA testing was not conducted. We note, however, Agent Nelson's testimony that she tested the samples which provided the best possibility for developing a profile. To the extent that untested evidence remains which could be subjected to Y-STR DNA testing, the post-conviction court determined that enough evidence existed for testing, and the record supports this determination.

Regarding the debris recovered from the victim's chest, Agent Nelson testified that she did not test the evidence but that in her experience, DNA was degraded by natural items such as twigs and leaves. She said that in the absence of blood or semen on the items, the likelihood of obtaining a DNA profile was not high. The post-conviction court did not err in determining that the Petitioner failed to show that this untested evidence was in an appropriate condition for DNA analysis.

Regarding the victim's jacket, Agent Nelson testified that the item was not submitted to the TBI laboratory for testing. She said that if the jacket had been recovered from an abandoned house six weeks after the victim's death, this would "affect the DNA testing." She said that in order for DNA testing to occur, a person would need to examine the jacket for stains that might contain biological material. No evidence at the post-conviction hearing established that the jacket had any stains that might be suitable for DNA testing. The post-conviction court did not err in determining that the Petitioner failed to show that untested evidence was suitable for DNA analysis.

Regarding the hair evidence from the rape kit, we note that the victim's plucked scalp and pubic hairs necessarily belonged to the victim and that analysis of her hair could not have identified a suspect. We acknowledge the possibility that the combed pubic hairs could have contained a suspect's hair. Agent Nelson testified the TBI laboratory did not analyze hair evidence. Because analysis of the victim's hairs would not reveal the DNA of a suspect, analysis would not have provided exculpatory evidence. Relative to the untested pubic hair combings, we acknowledge the trial testimony of the medical examiner that the victim had engaged in sexual intercourse shortly before her death. *Wesley Jones*, 2013 WL 772782, at *2. Agent Nelson testified that hairs could be analyzed for a DNA profile of its owner and that a hair sample could be compared to a sample from a known individual to determine if they matched. She also said that if a foreign substance were on hair, the substance could be swabbed for DNA testing, although the Petitioner does not contend and presented no evidence that the hairs contained any visible foreign substance. Even affording the Petitioner the presumption that DNA testing would be favorable to the defense, the Petitioner cannot establish a

sufficient probability to undermine confidence in the State's decision to prosecute him or in the conviction had the State or the jury known of the presumptively favorable DNA results. *See Powers*, 343 S.W.3d at 55. As we have noted, the post-conviction court was heavily swayed by the evidence of the Petitioner's guilt. In this regard, we note particularly the evidence that the Petitioner's DNA profile was detected from the material collected from the victim's fingernail clippings.

Regarding the "foreign material" in an envelope in the rape kit, Agent Nelson testified that she did not test the evidence. No evidence was presented at the hearing to show that the foreign material contained any biological material that was suitable for DNA analysis. As the post-conviction court determined, the Petitioner failed to show the existence of untested evidence which was suitable for testing.

The post-conviction court determined that the Petitioner failed to show his application was "made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or the administration of justice." T.C.A. § 40-30-304(4). We note that the Petitioner's contention is that DNA testing could identify the DNA of a perpetrator other than himself. We likewise note that the Petitioner is currently serving a life sentence and that DNA testing would not delay the execution of his sentence or the administration of justice, insofar as regards his serving a life sentence. *See Griffin v. State*, 182 S.W.3d 795, 799-800 (Tenn. 2006) (holding that record did not support a conclusion the petitioner's request for DNA testing was filed for "improper dilatory purposes" when, at the time the petition was filed, the petitioner was serving, and would continue to serve, his life sentence). We conclude that the court's determination regarding this factor is not supported by the record.

As we have stated, the Petitioner was required to establish that all four factors enumerated in Code section 40-30-304 existed relative to the items for which he sought DNA testing. Because he failed to do so, he is not entitled to relief pursuant to the Post-Conviction DNA Analysis Act.

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE